**Marin v Northwell Health, Inc.**

2025 NY Slip Op 30736(U)

March 4, 2025

Supreme Court, New York County

Docket Number: Index No. 154308/2018

Judge: John J. Kelley

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:     **HON. JOHN J. KELLEY**                          PART          56M

                                                  *Justice*

-------------------------------------------------------------------------------X

WALTER MARIN and HACER MARIN, as Executors of the
Estate of MUNEVVER KAYA, Deceased,

                              Plaintiff,

                    - v -

NORTHWELL HEALTH, INC., NORTH SHORE-LIJ HEALTH
SYSTEM, LENOX HEALTH GREENWICH VILLAGE, SAUL
D. MELMAN, NICHOLAS D. ALTMAN, OMAR CORUJO-
VAZQUEZ, MARY GRACE MENDOZA, JOHN F. MOORE,
and SHAWN P. MAZUR,

                              Defendants.

-------------------------------------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 154308/2018 |
| MOTION DATE | 12/18/2024 |
| MOTION SEQ. NO. | 001 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81

were read on this motion to/for                    JUDGMENT - SUMMARY                    .

In this action to recover damages for medical malpractice based on alleged departures from good and accepted practice, common-law negligence, lack of informed consent, and wrongful death, the defendants Northwell Health, Inc., North Shore-LIJ Health System, Lenox Health Greenwich Village (LHGV), Saul D. Melman, Nicholas D. Altman, Omar Corujo-Vazquez, John F. Moore, and Shawn P. Mazur (collectively the Northwell defendants)[1] move pursuant to CPLR 3212 for summary judgment dismissing the complaint insofar as asserted against them.[2] The plaintiffs oppose the motion. The motion is granted to the extent that the Northwell defendants are awarded summary judgment: (a) dismissing the complaint insofar as asserted

---

[1] Pursuant to a stipulation dated September 21, 2018, the plaintiffs discontinued the action against the defendant Mary Grace Mendoza.

[2] In a letter dated January 2, 2025, which was submitted to the court subsequent to the December 18, 2024 oral argument of this motion, the Northwell defendants withdrew so much of the motion as was premised upon the plaintiffs' lack of capacity to prosecute the action at the time when the action was commenced.

**154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.**                          **Page 1 of 29**
**Motion No. 001**

[* 1]

against Northwell Health, Inc., North Shore-LIJ Health System, Nicholas D. Altman, Omar Corujo-Vazquez, John F. Moore, and Shawn P. Mazur, (b) dismissing the lack of informed consent and common-law negligence causes of action insofar as asserted against LHGV and Melman, and (c) dismissing so much of the medical malpractice and wrongful death causes of action insofar as asserted against LHGV and Melman as was premised upon any departures from good and accepted practice allegedly committed in the course of attempting to resuscitate the plaintiffs' decedent after she had lost consciousness at LHGV or a failure to supervise other health-care personnel.  The motion is otherwise denied, as there are triable issues of fact as to (a) whether Melman departed from good and accepted practice in taking the decedent's medical history, in appreciating the significance of that history and the plaintiff's complaints, in omitting aortic dissection from his differential diagnosis or downplaying the likelihood that the decedent suffered from that condition, (b) whether he thus failed properly or timely to monitor and test the decedent for that condition, (c) whether those departures caused or contributed to her injuries and death, and (d) whether LHGV may be held vicariously liable for Melman's departures.

The crux of the plaintiffs' claim is that, on October 22, 2016, their decedent, Munevver Kaya, presented to LHGV, where, according to their bills of particulars, the Northwell defendants, including medical and nursing staff, negligently failed to diagnose and take adequate measures to treat ascending aortic dissection and, thus, failed to prevent her death later that day from cardiac tamponade and hemopericardium that had been caused by that ascending aortic dissection.  They alleged, in their summons, but not separately in their complaint, that the Northwell defendants failed to obtain their decedent's fully informed consent to any procedures that they ultimately performed.[3]

---

[3] A cause of action to recover for lack of informed consent, although akin to an action for medical malpractice, is a distinct cause of action (*see Pagan v State of New York*, 124 Misc 2d 366, 367 [Ct Claims 1984]).  Although the plaintiffs did not expressly assert a cause of action to recover for lack of informed consent in their complaint, the court will deem the allegations in the summons to constitute such a cause of action.

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No.  001

Page 2 of 29

2 of 29

As the plaintiffs further alleged in their bills of particulars, the Northwell defendants failed to take an adequate history or perform adequate examinations, failed to appreciate the diagnostic significance of the decedent's complaints, failed to appreciate the diagnostic significance of the results of the physical examinations that they did perform, failed adequately to monitor her blood pressure, and failed adequately to document and assess the basis for her complaints of vertigo, dizziness, chest pain, epigastric pain, and other pain. In addition, they asserted that the Northwell defendants failed adequately to document and assess her hemodynamic changes, failed to perform an x-ray, failed to transfer her to a facility or department where she could be given a computed tomography (CT) scan, and failed adequately to assess results of the laboratory testing that they did perform. The plaintiff further averred that the Northwell defendants committed malpractice by failing to transfer their decedent to a facility or department where she could receive surgical treatment, by failing to administer medications to stabilize her condition, and by failing adequately to monitor and assess her condition. Moreover, they asserted that the Northwell defendants negligently failed to consult with or refer their decedent to health-care providers who were adequately trained and experienced to assess her and to formulate and execute a proper treatment plan. The plaintiffs additionally alleged that the Northwell defendants negligently failed to undertake adequate steps to resuscitate their decedent when she lost consciousness at LHGV subsequent to the aortic dissection.

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether

summary judgment is appropriate, the motion court should draw all reasonable inferences in favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp.*, 18 NY3d at 503). A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn.*, 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.,* 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr.*, 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods.*, 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

"To sustain a cause of action for medical malpractice, a plaintiff must prove two essential elements: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of plaintiff's injury" (*Frye v Montefiore Med. Ctr.*, 70 AD3d 15, 24 [1st Dept 2009]; *see Foster-Sturrup v Long,* 95 AD3d 726, 727 [1st Dept 2012]; *Roques v Noble*, 73 AD3d 204, 206 [1st Dept 2010]; *Elias v Bash*, 54 AD3d 354, 357 [2d Dept 2008]; *DeFilippo v New York Downtown Hosp.*, 10 AD3d 521, 522 [1st Dept 2004]). A medical malpractice cause of action may be premised upon a claim that those departures caused or allowed the plaintiff's condition to worsen, and thus deprived him or her of an opportunity for a cure or a better outcome (*see Mortensen v Memorial Hosp.*, 105 AD2d 151, 156, 159 [1st Dept 1984]; *Kallenberg v Beth Israel Hosp.*, 45 AD2d 177, 178 [1st Dept 1974], *affd no op.* 37 NY2d

**154308/2018 MARIN, WALTER vs. NORTHWELL HEALTH, INC.**
**Motion No. 001**

Page 4 of 29

719 [1975]).  Where a physician fails properly to diagnose a patient's condition, thus providing less than optimal treatment or delaying appropriate treatment, and the insufficiency of or delay in treatment proximately causes injury, he or she will be deemed to have departed from good and accepted medical practice (*see Perez v Fitzgerald,* 115 AD3d 177, 178 [1st Dept 2014]; *Perlin v King*, 36 AD3d 495, 495 [1st Dept 2007]; *see generally Zabary v North Shore Hosp. in Plainview,* 190 AD3d 790, 795 [2d Dept 2021]; *Lewis v Rutkovsky*, 153 AD3d 450, 451 [1st Dept 2017]; *Monzon v Chiaramonte*, 140 AD3d 1126, 1128 [2d Dept 2016] ["(c)ases . . . which allege medical malpractice for failure to diagnose a condition . . .  pertain to the level or standard of care expected of a physician in the community"]; *O'Sullivan v Presbyterian Hosp. at Columbia Presbyterian Med. Ctr.*, 217 AD2d 98, 101 [1st Dept 1995]).

To make a prima facie showing of entitlement to judgment as a matter of law, a defendant physician moving for summary judgment must establish the absence of a triable issue of fact as to his or her alleged departure from accepted standards of medical practice (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]; *Barry v Lee*, 180 AD3d 103, 107 [1st Dept 2019]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24) or establish that the plaintiff was not injured by such treatment (*see Pullman v Silverman,* 28 NY3d 1060, 1063 [2016]; *McGuigan v Centereach Mgt. Group, Inc.*, 94 AD3d 955 [2d Dept 2012]; *Sharp v Weber*, 77 AD3d 812 [2d Dept 2010]; *see generally Stukas v Streiter*, 83 AD3d 18 [2d Dept 2011]).  To satisfy this burden, a defendant must present expert opinion testimony that is supported by the facts in the record, addresses the essential allegations in the complaint or the bill of particulars, and is detailed, specific, and factual in nature (*see Roques v Noble*, 73 AD3d at 206; *Joyner-Pack v Sykes*, 54 AD3d 727, 729 [2d Dept 2008]; *Koi Hou Chan v Yeung*, 66 AD3d 642 [2d Dept 2009]; *Jones v Ricciardelli*, 40 AD3d 935 [2d Dept 2007]).  If the expert's opinion is not based on facts in the record, the facts must be personally known to the expert and, in any event, the opinion of a defendant's expert should specify "in what way" the patient's treatment was proper and "elucidate the standard of care" (*Ocasio-Gary v Lawrence Hospital,* 69 AD3d 403, 404 [1st Dept

**154308/2018  MARIN, WALTER vs. NORTHWELL HEALTH, INC.**
**Motion No.  001**

Page 5 of 29

5 of 29

2010]).  Stated another way, the defendant's expert's opinion must "explain 'what defendant did and why'" (*id.*, quoting *Wasserman v Carella*, 307 AD2d 225, 226 [1st Dept 2003]).  Moreover, as noted, to satisfy his or her burden on a motion for summary judgment, a defendant must address and rebut specific allegations of malpractice set forth in the plaintiff's bill of particulars (*see Wall v Flushing Hosp. Med. Ctr.*, 78 AD3d 1043 [2d Dept 2010]; *Grant v Hudson Val. Hosp. Ctr.*, 55 AD3d 874 [2d Dept 2008]; *Terranova v Finklea*, 45 AD3d 572 [2d Dept 2007]).

Once satisfied by the defendant, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact by submitting an expert's affidavit or affirmation attesting to a departure from accepted medical practice and/or opining that the defendant's acts or omissions were a competent producing cause of the plaintiff's injuries (*see Roques v Noble*, 73 AD3d at 207; *Landry v Jakubowitz*, 68 AD3d 728 [2d Dept 2009]; *Luu v Paskowski*, 57 AD3d 856 [2d Dept 2008]).  Thus, to defeat a defendant's prima facie showing of entitlement to judgment as a matter of law, a plaintiff must produce expert testimony regarding specific acts of malpractice, and not just testimony that contains "[g]eneral allegations of medical malpractice, merely conclusory and unsupported by competent evidence tending to establish the essential elements of medical malpractice" (*Alvarez v Prospect Hosp.,* 68 NY2d at 325; *see Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).  In most instances, the opinion of a qualified expert that the plaintiff's injuries resulted from a deviation from relevant industry or medical standards is sufficient to preclude an award of summary judgment in a defendant's favor (*see Murphy v Conner*, 84 NY2d 969, 972 [1994]; *Frye v Montefiore Med. Ctr.*, 70 AD3d at 24).

In support of their motion, the Northwell defendants submitted the pleadings, the plaintiffs' bills of particulars, transcripts of the parties' deposition testimony, relevant medical and hospital records, the note of issue, discovery conference orders, the stipulation of discontinuance against Mendoza, a statement of allegedly undisputed material facts, an attorney's affirmation, and the expert affirmation of board-certified internist and emergency-medicine, critical-care, and pulmonary-disease specialist Marc Silberman, M.D.

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.                    Page 6 of 29
Motion No. 001

Dr. Silberman opined that none of the Northwell defendants departed from good and accepted practice, and that nothing that they did or did not do caused or contributed to the decedent's injuries or death.  He concluded that the Northwell defendants did all that was required by the applicable standard of care and, indeed, all that they could have done to avert the aortic dissection itself, the consequences of the aortic dissection, and the decedent's death, but that nothing they could have done would have prevented that outcome.

As Dr. Silberman interpreted the decedent's medical records, she was 58 years old when she first presented to New York Doctors Urgent Care in Manhattan during the mid-morning of October 22, 2016, primarily complaining of dizziness, upon which personnel at that facility obtained her recent medical history, which included dizziness, pain in the middle of her chest, sweating, and chills that all had begun 30 minutes earlier.  Staff at the urgent care facility measured her vital signs, and reported that her blood pressure was 100/60, her pulse rate was 64 beats per minute, her respiration rate was 19 breaths per minute, and her oxygen saturation level was 97% while breathing room air.  She informed health-care staff that she previously had suffered from vertigo.  She also specifically complained of chest tightness, vertigo, and sweating that had commenced 30 minutes earlier, and pain at a level of 7 on a scale of 10 that was constant, albeit non-radiating, but which did not hurt upon palpation.  She reported a history of smoking, but denied a history of hypertension, cardiac problems, shortness of breath, wheeze, or headache.  Personnel at the urgent care facility reported that the decedent was alert and lucid, with appropriate mood and affect.  Upon examining the decedent, health-care personnel at the urgent care center wrote that her signs were all normal, and reported that she evinced no respiratory distress, that her lungs were clear, and her breath sounds were equal, with no rales, rhonchi, or wheezes.  They further reported that her cardiovascular examination reflected a regular heart rate and rhythm, no murmur, normal distal pulses, and normal capillary refill, with no jugular venous distention.  Her abdominal examination also was reported as normal.  New York Doctors Urgent Care physicians diagnosed the decedent with chest tightness, gave her

**154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.**                    **Page 7 of 29**
   **Motion No.  001**

aspirin, and administered three liters of oxygen to her, but declined to perform an electrocardiogram (EKG), purportedly because she wished immediately to be seen at a hospital emergency room.

Personnel at the urgent care facility called an ambulance and, while the decedent was being transported to LHGV, ambulance personnel examined her. In their prehospital care report, an emergency medical technician reported "dizziness" as his or her impression of the plaintiff's condition. According to Dr. Silberman's interpretation of that report, the examination undertaken in the ambulance revealed that the decedent evinced normal, unlabored breathing, with clear lung sounds, and normal sinus heart rhythms. He asserted that this report indicated that, at 10:33 a.m. on October 22, 2016, the decedent had a normal blood pressure of 119/74, a pulse rate of 62 beats per minute, and a respiration rate of 16 breaths per minute. He further asserted that, at 10:37 a.m., repeat measurements of the decedent's vital signs were in the same range, with a pulse oximetry reading of 96%, while a third set of vital signs taken at 10:38 a.m. also were within normal limits, with blood pressure of 118/75, a pulse rate of 60 beats per minute, and a respiration rate of 16 breaths per minute. As Dr. Silberman interpreted the narrative history of the ambulance medical report,

> "the patient had a history of vertigo and stated that 'this feels like vertigo.' She reported minor mid-sternal chest discomfort and had no other complaints, with no vomiting. The 3-lead EKG monitor demonstrated normal sinus rhythm. A 12-lead EKG was also performed, demonstrating sinus rhythm at 60 beats per minute, with possible left ventricular hypertrophy."

The ambulance crew delivered the decedent to the LHGV emergency department at 10:54 a.m. on October 22, 2016.

As Dr. Silberman explained it, immediately upon the decedent's arrival at LHGV, a triage nurse reported that the decedent had been brought to the hospital in connection with chest pain, as well as complaints of chest discomfort and vertigo. At 11:05 a.m. on October 22, 2016, the defendant Melman, an LHGV physician who specialized in emergency medicine, reportedly interviewed the decedent. According to Melman's notes, the decedent's chief complaint was

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.                    Page 8 of 29
Motion No. 001

[* 8]

epigastric abdominal pain, which she rated as 4 on a scale of 10, with presenting symptoms of nausea and abdominal discomfort. As Dr. Silberman summarized Melman's notes,

> "[s]ignificant negative findings included no diarrhea, no dizziness, no fever, no vomiting, no weakness, no cough, no shortness of breath, no chest pain, and no sensory, visual, or speech changes. The location of the pain was upper epigastric area. There was no radiation. The note reflects that the patient stated that she had a chronic history of vertigo, which she described as a feeling of dizziness with the ground moving up and around her. She described her symptoms as 'the same vertigo feelings I always have.' She stated that when she was walking that day, her vertigo symptoms caused her to slowly lie down on the sidewalk and subsequently, the symptoms resolved."

Dr. Silberman proceeded to reiterate the contents of the note, as follows:

> "She described the upper abdominal pain as intermittent pain that was nonprogressive, with no radiation to the back, chest, neck, jaw, arm, or shoulder. She denied diaphoresis. She described mild nausea, no vomiting, no diarrhea, and no fevers. She denied recent chest pain, shortness of breath, cough, any recent changes in exercise tolerance, or abdominal pain. She denied prior cardiac history or lung problems. She was a current daily smoker, one to two cigars per day. Upon review of systems, there was no chest pain, only abdominal pain and nausea."

At 11:08 a.m., the defendant patient care assistant Mazur administered a 12-lead EKG test, and handed the results to Melman. Mazur reported the decedent's heart rhythm as normal, and administered 325 milligrams of aspirin to her. The LHGV chart indicated that the decedent's blood pressure was then 96/76, and that she then had a heart rate of 56 beats per minute, a respiration rate of 18 breaths per minute, a temperature of 98 degrees Fahrenheit, and an oxygen saturation reading 100% while breathing room air. According to Dr. Silberman, this was the only interaction that Mazur had with the decedent.

Melman reported in the decedent's chart that he physically examined her at that time, and that she was able to get out of bed from supine to a standing position without dizziness, vertigo, or lightheadedness, and that she was able to ambulate with a normal, steady gait. According to Melman's deposition testimony, the decedent was in no apparent distress, made no specific complaints of chest pain, and was watching television. His findings upon examination were characterized as "normal," with a cardiac examination revealing that the

154308/2018  MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No.  001

Page 9 of 29

9 of 29

[* 9]

decedent evinced a normal heart rate, regular rhythm, normal heart sounds of S1 and S2, no murmurs, rubs, or gallops, and no jugular venous distention.  Melman placed the decedent on a continuous cardiac monitor, drew blood for testing, and prescribed bed rest.  According to Dr. Silberman's reading of the decedent's chart, her first blood test for the presence of troponin, a protein that might indicate necrosis of heart tissue, was, in effect, "undetectable," since it measured less than 0.017 nanograms of troponin per liter of blood (ng/L), which he described was "an indication of the absence of any damage to her heart muscle."  Dr. Silberman asserted that, although the EKG reflected normal sinus rhythm, the decedent's heart rate was 57 beats per minute, and he noted the presence of a nonspecific T-wave abnormality.  Melman testified at his deposition that the decedent essentially remained normal throughout her stay at the emergency department.

As Dr. Silberman further summarized the decedent's LHGV chart, he noted that, at 11:32 a.m. on October 22, 2016, the defendant nurse Moore reported the results of a second set of vital sign readings taken at 11:30 a.m., documenting the decedent with a heart rate of 60 beats per minute, blood pressure of 117/73, and a respiratory rate of 18 breaths per minute, and wrote that she had spontaneous, unlabored breathing, with clear breath sounds and strong peripheral pulses.  According to this note, the decedent's chief complaints remained chest discomfort, with symptoms of dizziness and nausea, with radiation of pain to the epigastric region, that is, "right above [her] stomach," although Moore also reported significant negative findings with respect to other pain, chills, cough, diaphoresis, fever, jaw pain, and left arm pain, and specifically noted that the decedent denied chest pain.  Dr. Silberman adverted to Moore's deposition testimony, as well as that of the two plaintiffs, noting that they all corroborated the decedent's complaint of epigastric pain similar to indigestion.  According to Moore's note, the decedent reiterated her complaint of having suffered from vertigo while walking in the street that morning, and recounted a history of vertigo, with the last episode having occurred two years earlier, but also reported that her vertigo had subsided.  According to Dr. Silberman, the note

**154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.**
**Motion No.  001**
Page 10 of 29

10 of 29

further indicated that the decedent was placed on a cardiac monitor to measure blood pressure and oxygen saturation, and that an intravenous saline drip was administered as well.

As Dr. Silberman recounted it, at 12:50 p.m. on October 22, 2016, Melman reported that the decedent remained comfortable in bed, and was not then complaining of chest pain or shortness of breath, but was continuing to complain of "mild" epigastric pain. Melman reported in his notes that her abdomen was soft and nontender, and that his readings of the cardiac monitor continued to demonstrate normal vital signs. According to Dr. Silberman, Melman reviewed laboratory results and communicated them to the decedent, after which he formulated a plan to continue monitoring, and to repeat troponin level blood testing at 5:00 p.m. As Dr. Silberman characterized Melman's deposition testimony, the purpose of ordering serial testing for troponin levels was to evaluate the decedent for the possibility of "atypical acute coronary syndrome," and to rule in or out the possibility that the decedent's upper abdominal pain could be an atypical presentation possibly suggestive of ischemia. According to Dr. Silberman,

> "MELMAN had considered, in his differential diagnosis, acute coronary syndrome (ACS), and his plan included continuous monitoring and serial troponin levels to rule out this condition. He testified that he initially considered multiple serious conditions at the top of his differential, including aortic dissection, although those conditions were all very unlikely. *Aortic dissection was eliminated from his differential diagnosis* based upon the patient's history of present illness, review of systems, and physical examination. Indeed, her complaints were not consistent with an aortic dissection. She did not complain of severe chest pain with radiation of pain to the back; she appeared comfortable, her skin was dry, and she did not have J[ugular] V[enous] D[istention] or muffled heart tones. Her EKG was not suggestive of pericardial effusion. She did not have hypertension and did not have any other findings on physical examination to suggest a dissecting aortic aneurysm"

(emphasis added).

As Dr. Silberman described the entries in the decedent's chart, at 4:41 p.m. on October 22, 2016, LHGV personnel drew blood from the decedent for a second test of troponins levels, they delivered this blood sample to the LHGV laboratory at approximately 5:00 p.m., and Melman met with the decedent shortly after the blood had been drawn, thereafter noting that she continued to appear comfortable, watching television, and without any complaints.

154308/2018  MARIN, WALTER vs. NORTHWELL HEALTH, INC.                    Page 11 of 29
Motion No.  001

11 of 29

At approximately 5:24 p.m. on October 22, 2016, LHGV staff found the decedent on the floor of her room, unresponsive, with agonal breathing, and in cardiac arrest, while the cardiac monitor demonstrated pulseless electrical activity. Staff initiated cardiopulmonary resuscitation (CPR) measures, and Melman intubated the decedent. Dr. Silberman asserted that the advanced cardiovascular life support protocol for patients exhibiting pulseless electrical activity "was continued with CPR and medications," and that, in the course of this process, the defendant emergency medicine specialists Altman and Corujo-Vazquez assisted Melman. According to Dr. Silberman, a bedside echocardiogram revealed the presence of pericardial effusion, and Altman thereupon performed an emergent, ultrasound-guided pericardiocentesis by inserting the required needle, while Corujo-Vazquez assisted Altman with the ultrasound guidance. As Dr. Silberman summarized the deposition testimony and medical chart, their first attempt at removal of fluid from the pericardium was unsuccessful, but a second attempt achieved successful aspiration of 50 milliliters of dark red blood. He averred that, despite ongoing resuscitation efforts, there was no return of spontaneous circulation, the decedent's cardiac contractility progressively worsened to cardiac standstill, and she was pronounced dead at 5:44 p.m. Dr. Silberman explained that, as was "evident from both the chart and relevant deposition testimony, neither DR. ALTMAN nor DR. CORUJO-VAZQUEZ had anything to do with the evaluation or treatment of the decedent prior to her cardiac arrest," but only were involved in attempts at resuscitation after the aortic dissection had occurred.

The court notes that, in the LHGV medical chart, there is no report of any result of the troponin testing of the blood sample drawn at 4:41 p.m. on October 22, 2016. Dr. Silberman noted that the subsequent autopsy reflected that the decedent's cause of death was cardiac tamponade and hemopericardium, due to ascending aortic dissection, which, in turn, was a consequence of hypertensive cardiovascular disease.

With respect to the decedent's presentation to the emergency department at LHGV, Dr. Silberman opined that hers was an "unusual, atypical presentation" for ongoing or imminent

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No.  001

Page 12 of 29

acute aortic dissection.  As he explained it, the symptoms of aortic dissection would include "severe chest pain radiating to the back or neck, often described as a tearing sensation from the neck down the back, severe pain rated at 10/10, with tachycardia, syncope, and diaphoresis."  He concluded that there was nothing about the decedent's presentation to suggest aortic dissection, inasmuch as her symptoms were nonspecific, and her complaints were of "vertigo and [she] reported a history of chronic vertigo, describing it as the same feeling of dizziness she had experienced in the past," a history that he characterized as "not concerning."  Dr. Silberman averred that the decedent's complaints did not

> "indicate that she experienced syncope or fainting.  She reported feeling better after lying down in the street.  Moreover, the vertigo was not due to blood loss, as she had a normal hematocrit of 44.  She complained of epigastric abdominal pain at a level of 4/10.  Upper epigastric pain over the stomach is sometimes described by patients as chest pain and can in some cases be reflective of a cardiac etiology, but this description of epigastric pain is not typical of the pain associated with aortic dissection.  Aortic dissection would typically present with persistent, severe pain in the upper chest, neck, back or shoulder.  This patient also denied diaphoresis, a symptom that is typically present in the setting of acute aortic dissection."

Dr. Silberman thus opined that all of these complaints, as well as the clinical findings upon physical examination, "were appropriately considered in the formulation of the assessment and plan in the emergency department," and that emergency department personnel, including Melman, properly took into account the decedent's lack of a significant medical history, normal vital signs, and normal laboratory results.  Dr. Silberman concluded that, contrary to the plaintiffs' allegations, the LHGV emergency department staff took a detailed medical history, that they appropriately assessed the decedent at triage, that they "subsequently specifically questioned [her] about chest pain given her presenting history of chest discomfort," and that they appropriately monitored and worked her up.  According to Dr. Silberman, the decedent "specifically denied chest pain" to both Melman and Moore, after which Melman performed a comprehensive, detailed examination, which was "essentially normal."  In this respect, Dr. Silberman averred that the decedent described her upper abdominal pain as intermittent and

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No.  001

Page 13 of 29

13 of 29

nonprogressive, without radiation to the back, chest, neck, jaw, arm, or shoulder, and, although she described "mild nausea," her gastric complaints did not include vomiting or diarrhea, and she also denied experiencing a fever or shortness of breath. Dr. Silberman asserted that this "clinical picture was simply not suggestive of aortic dissection, symptoms of which would typically include elevated blood pressure, elevated heart rate, increased respiratory rate, and severe pain."

Consequently, Dr. Silberman opined that,

> "[a]lthough aortic dissection was initially one of the many possibilities considered by DR. MELMAN in his differential diagnosis, he appropriately ruled it out based upon her negative symptomatology, his history and physical examination, as well as routine blood work, normal cardiac enzymes, and serial EKG's. Based on the patient's presentation, it was reasonable and appropriate for DR. MELMAN to continue to consider the possibility of atypical acute coronary syndrome."

Thus, he concluded that both Melman and the emergency department team exercised good medical judgment in monitoring the decedent, and in observing her for any change in symptoms until a second troponin level test had been performed to rule out myocardial injury. As he described it, this "cautious approach with an extended period of observation and serial blood testing was well within the standard of care," and was appropriate in the decedent's case.

Dr. Silberman further opined that the symptoms with which the decedent initially presented, coupled with the results of her examination and testing,

> "did not rise to the threshold indicating a need for a workup for aortic dissection, including ordering a chest x-ray, transferring the patient to a facility where she could undergo a CT angiogram or surgical treatment, or administering medications for aortic dissection."

Hence, he concluded that it was not a departure for Melman or emergency room staff to have declined to order such a workup, take a chest x-ray, or transfer the decedent for a CT angiogram or surgery. In addition, Dr. Silberman asserted that the decedent was appropriately and adequately examined, assessed, and monitored, and that all documentation was appropriate, inasmuch as she remained on a cardiac monitor, which encompassed noninvasive blood pressure measurements with frequent recordings. With respect to the blood pressure

154308/2018  MARIN, WALTER vs. NORTHWELL HEALTH, INC.                    Page 14 of 29
Motion No. 001

14 of 29

[* 14]

readings, he asserted that frequent blood pressure measurements are not typically or continuously documented unless there is a significant change in the blood pressure or a significant change in the patient's condition, which did not occur here until the decedent suddenly lost consciousness more than six hours after arriving in the emergency department. Hence, he concluded that there was no indication for any specialty consultations or referral to other healthcare facilities or providers to formulate a treatment plan, since the treatment rendered to the decedent "was well within the realm of an emergency department workup up until the time of her sudden, unpredictable cardiac arrest."

Although Dr. Silberman noted that, at 1:00 p.m. on October 22, 2016, the decedent had vomited after eating part of a sandwich, there was no blood in the vomitus, she denied dizziness, and she walked back to her bed with a steady gait, which suggested to him that "[t]hese symptoms could also potentially be consistent with gastritis."

In connection with the resuscitation attempts made by Altman and Corujo-Vazquez, Dr. Silberman averred that they did not fail to take adequate steps, and that the plaintiffs' contention to the contrary had "no support in the record and no further specification as to what steps should have been taken that may have altered the outcome." As he explained it,

> "[a]ortic dissection is, unfortunately, a devastating disease with very high mortality, and in this case, death occurred in the absence of any malpractice. The patient was found in cardiac arrest at approximately 5:24 P.M., and resuscitation was immediately and promptly initiated at 5:25 P.M. External cardiac compression was begun by DR. MELMAN, and the patient was intubated at 5:27 P.M. This was an emergent and necessary procedure. . . . Resuscitation was appropriately carried out with respect to the intubation and the medications provided, which included epinephrine, atropine, bicarbonate, and calcium."

Dr. Silberman further asserted that the pericardiocentesis that Altman performed, with ultrasound guidance assistance from Corujo-Vazquez, was an emergency and necessary procedure that was performed in a timely, almost immediate fashion, and was performed according to the standard of care applicable to resuscitation efforts. Specifically, he concluded that the performance of a point-of-care heart ultrasound is consistent with good and accepted

**154308/2018  MARIN, WALTER vs. NORTHWELL HEALTH, INC.**
**Motion No.  001**

Page 15 of 29

medical practice, and that Altman accurately identified the pericardial effusion, as later corroborated by the autopsy findings, thus indicating "appropriate technique and proper interpretation of the ultrasound images."  As Dr. Silberman further explained it, when a patient is in cardiac arrest, pericardiocentesis is a "challenging procedure in the setting of ongoing chest compressions and resuscitation efforts," and, consequently, the decedent's "unfortunate outcome was in no way caused by any action or inaction on the part of" Northwell defendants.

Dr. Silberman expressly rejected, as unsupported by the record, the plaintiffs' contention that LHGV personnel were improperly supervised.  As he phrased it, "[a]llegations against these individuals regarding the failure to monitor the patient or to inform and consult with the physicians and nurses who were supervising her care are baseless and boilerplate," since the decedent was continuously monitored by the emergency department team, including Moore. Dr. Silberman further averred that Mazur's only involvement was the performance of the EKG, that this task "was promptly and timely accomplished upon the patient's arrival," and that the EKG was properly performed.  He asserted that all evaluations of the decedent were well documented, and that there was no evidence whatsoever regarding a failure to report or communicate her complaints or findings from her examinations.

In opposition to the motion, the plaintiffs relied upon the same documentation that the Northwell defendants had submitted, and also submitted an attorney's affirmation, relevant Surrogate's Court decrees, a memorandum of law, and the affirmation of a board-certified emergency, occupational, and preventive medicine specialist, internist, and gerontologist. The plaintiffs' expert asserted that Melman and, hence, LHVG, committed malpractice in failing formally to consider an aortic dissection in their differential diagnoses, and failing appropriately to monitor or test the decedent for aortic dissection, and that this malpractice deprived the decedent of the opportunity for a cure or better outcome, thus causing her to sustain the aortic dissection that led to her death.

The plaintiffs' expert asserted that, if

**154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.**
**Motion No.  001**

**Page 16 of 29**

16 of 29

"Melman had paid sufficient attention to his patient's condition and the information available to him, he would have recognized that arterial dissection was a potential cause of her complaints and could have secured appropriate and life-saving care for her. Instead, he failed to recognize this potential diagnosis and left her untreated until she developed the cardiac tamponade that killed her."

The expert expressly rejected Dr. Silberman's opinion that Melman fully understood and appreciated the medical history that he had obtained from the decedent. As the expert explained it, good and accepted practice for an emergency medicine provider requires that the provider obtain information about the patient's condition and history from "all reasonably available sources," so that the provider's evaluation may be as informed as possible. The plaintiff's expert asserted that, to identify the etiology of a patient's complaints, an emergency medicine specialist must, after formulating a differential diagnosis, compare the available information with the known characteristics of the diseases or conditions in the list of potential diagnoses, "starting with the most dangerous ones." In this respect, the plaintiff's expert asserted that the sources of information that Melman had available to him when the plaintiff presented to LHGV on October 22, 2016 were the decedent herself, information recorded by health-care staff at the urgent care center earlier that day, information in the ambulance report, and information that could be provided to him by the plaintiff Hacer Marin (Marin), who was the decedent's sister, and was present at the emergency department throughout that day while the decedent was being evaluated and treated. The expert further noted that Melman had available to him the results of tests and assessments that had been undertaken at LHGV.

The plaintiffs' expert opined that Melman's information gathering was below the applicable standard of care, inasmuch as he either did not take a complete and appropriate history, as was warranted by the decedent's presentation and complaints, "did not pay attention and/or record the history given to him by the patient . . . , and did not seek to discover or to find out what had transpired at the Urgent Care facility[,] including the actual history recorded by the physician working at the UCC who originally saw the decedent." As the plaintiffs' expert

continued, Melman "did not review, ascribe relevance to, or employ the EMS record in his approach to diagnosing or treating" the decedent. The plaintiffs' expert asserted that Melman

> "knew or should have known as an Emergency Medicine Specialist that information provided by the pre-hospital caregiver is vital to consider when evaluating patients in the Emergency Department. He also did not obtain information from Ms. Kaya's sister, Hacer Marin, who was present in the E.R. throughout the day and when she stepped out, was always reachable by telephone."

The expert concluded that Melman misapprehended the decedent's actual condition, and took improper steps that easily could have been avoided if he had adhered to the applicable standard of care in collecting relevant information.

Specifically, the plaintiffs' expert noted that it was "striking" that Melman never found out from Marin that that the decedent had been complaining of chest pain before she arrived LHGV. The expert adverted to Marin's deposition testimony, in which she testified that the decedent had called her, complaining of chest pain, even before she presented to the urgent care facility during the morning of October 22, 2016, and again complained of chest pain when she called Marin from the LHGV emergency department at about 11:00 a.m. on that date, shortly after the decedent arrived there. The expert further noted that Marin's testimony indicated that Marin also spoke to the decedent in person at the emergency department when Marin arrived there, and again when the decedent was eating a sandwich that Marin and her husband, the plaintiff Walter Marin, had bought for her, and that the decedent had complained of chest pain on both occasions. The expert, while noting that Melman had testified at his deposition that he had indeed spoken with the Marins, nonetheless asserted that it was clear from Marin's testimony that Marin was anxious to speak with a doctor about the decedent's chest pains, but that she never got to speak with Melman prior to the decedent's death, but only thereafter. The expert concluded that, even if Melman had spoken with the Marins, he didn't elicit any information about the decedent's complaints of chest pain, "which is a deviation from good practice."

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No. 001

Page 18 of 29

18 of 29

According to the plaintiffs' expert, inasmuch as Melman did not have a full and complete picture of the decedent's complaints and symptoms, he failed to perform the assessments that would have guided him to include arterial aortic dissection high up in his differential diagnosis. The expert concluded that, had Melman included this diagnosis in his differential diagnosis, and pursued appropriate and available tests to rule out this "life-threatening and treatable" cause of her symptoms, "he could have pursued and arranged treatment for this patient, treatment that offered the strong potential for saving her life." More specifically, the plaintiffs' expert asserted:

> "If Dr. Melman had practiced in a reasonable and prudent fashion according to the standard of care for a physician practicing Emergency Medicine in 2016, he would have learned from Ms. Kaya that she had suddenly, at about 10:00 a.m., developed chest pain, dizziness, sweats, and chills. Her pain was *constant.* This was confirmed in the EMS Prehospital Care Report Summary, which confirmed that Ms. Kaya had had 'vertigo', and that she had *midsternal chest discomfort*. Hacer Marin testified that her sister told her that she had a pain in her chest and had to sit down on the sidewalk in a 10:00 a.m. phone call to her sister; and that she called again at 11:00 a.m. once again complaining about pain in her chest. She later complained about her inability to swallow a sandwich that had been brought for her *because of chest pain"*

(emphasis added).

The plaintiffs' expert asserted that, when the decedent presented to LHGV, her initial blood pressure was 96/76, with a heart rate of 56 beats permit. The expert opined that, contrary to Dr. Silberman's conclusions, these readings were abnormal, as they reflected that the decedent was suffering from bradycardia, that is, an abnormally slow heartbeat, as well as from relatively low systolic blood pressure, with a narrow pulse pressure. The expert asserted that these measurements can be seen in, and are thus signs of, aortic dissection with pericardial effusion and early tamponade from the buildup of fluid, specifically blood, in the pericardial sac. The expert noted that the decedent had been administered intravenous fluid at LHGV, "which would have improved the cardiac output and vital signs in early tamponade," and would have explained the normalized pulse pressure that had been recorded in connection with the second set of vital signs taken at LHGV, but would not have treated a low heart rate. The expert asserted that Melman, by failing to account for that low heart rate, departed from good practice,

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.                    Page 19 of 29
Motion No. 001

19 of 29

and prevented him from making a proper diagnosis. According to the plaintiffs' expert, the decedent thus presented to Melman as a woman with a high body mass index, chest pain, sweating, and dizziness, as well as an inappropriately low heart rate and vital signs, including narrow pulse pressure.

The plaintiffs' expert asserted that,

> "[t]he degree of attention that Dr. Melman paid to his patient is illustrated by the things about her that he got wrong. For example, in his note of 11:05 a.m., he describes her as 'having a chronic history of vertigo which she describes as a feeling of dizziness with the ground moving up and around her. The symptoms of vertigo that the patient describes today while walking was "the same vertigo feelings I always have."' Ms. Kaya's sister lived in the same building with her and was very close to her. Her account of her sister's vertigo is dramatically different. She testified in pages 32-34 of her deposition that Ms. Kaya had a single episode of vertigo in 2009 – years before her visit to the LHGV ER underlying this lawsuit. She was seen by a neurologist and the problem went away in approximately one week and never returned."

The expert concluded that, had Melman undertaken even a minimal investigation, he would have realized that there were four potentially fatal conditions consistent with the decedent's complaints: a myocardial infarction, myocardial ischemia with potential dysrhythmia or other complications, a pulmonary embolus, and aortic dissection. The expert explained that, at the time when Melman was presented with the decedent's signs, symptoms, and test results, "it was his role to identify and rule out or rule in each of the most serious and life-threatening conditions" consistent with those signs, symptoms, and results, and that, to properly effectuate the purpose of a differential diagnosis, he "was expected . . . to consider each of these conditions and treat it as a presumptive diagnosis until it could be definitively ruled out."

As the expert explained it, the appropriate workup for suspected myocardial infarction includes serial EKGs and troponin level assessments, with hospital admission and monitoring, while the workup for suspected myocardial ischemia without infarction includes admission to a coronary care unit or a stepdown unit, the administration of serial EKGs and troponin level testing, management by cardiologists, and further diagnostic testing and intervention. The expert asserted that the workup for a pulmonary embolism includes testing for D-dimer proteins

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.                Page 20 of 29
Motion No.  001

20 of 29

in the blood that would detect whether a patient's body is forming and breaking down significant blood clots, and CT imaging to locate any embolisms. As relevant here, the expert asserted that the appropriate workup for the detection of a suspected aortic dissection, with pericardial hemorrhagic effusion and early tamponade, includes a CT angiogram of the chest and bedside cardiac ultrasound testing,

> "as well as some basic examinations and testing[,] including comparing blood pressure readings from both arms and taking a chest x-ray to look for blunting of a hemi-diaphragm caused by bleeding and widening of the mediastinum caused by the dissection and expansion of the aorta and/or bleeding into the mediastinum."

The plaintiffs' expert adverted to Melman's deposition testimony, in which Melman averred that both ultrasound and CT angiogram testing apparatus were available to him at LHGV, and that, in any event, pericardial effusion could be diagnosed with an ordinary CT scan, which was also available, as well as bedside ultrasound.

The plaintiffs' expert opined that Melman's failure to employ diagnostic tests that were available to him, and his concomitant failure fully and appropriately to consider, and thereupon to rule in or rule out, these life-threatening conditions were deviations from the applicable standard of care, and were a substantial cause of his failure promptly to diagnose the decedent's aortic dissection and early tamponade and to initiate appropriate transfer and treatment. As the expert described it, this failure and concomitant delay "permitted these conditions to progress undetected and untreated to life-threatening cardiac tamponade, cardiac arrest, and death," and that,

> "[b]ut for this deviation from good practice by Dr. Melman, it is more likely than not that Ms. Kaya would have received timely and appropriate treatment for her arterial dissection and early cardiac tamponade and that this treatment would have saved her life."

With respect to several of Dr. Silberman's assumptions, the plaintiffs' expert asserted that Dr. Silberman did not address the blood pressure measurement taken shortly after the decedent's admission to LHGV, "why that reading should or should not have been an indication

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.                Page 21 of 29
Motion No.  001

21 of 29

[* 21]

that arterial dissection had to be considered in the differential diagnosis," or why appropriate studies had not been initiated to rule that diagnosis in or out. Although Dr. Silberman made some mention of the decedent's chest pain, the plaintiffs' expert asserted that he did not assert anything in his affirmation about Marin's reports that the decedent complained of chest pain throughout the day up until her death, or about why Melman did not secure this information from her. Nor, according to the plaintiffs' expert, did Dr. Silberman address the issues of whether Melman, in fact, had learned of the complaints that the decedent had made at the urgent care center, which included dizziness, constant pain in middle of her chest, chest tightness, sweating, chills, and vertigo, why obtaining this information was not required by the applicable standard of care, and, thus, whether Melman's failure to learn, consider, and appreciate these complaints constituted a deviation from the standard of care.

The plaintiffs' expert further faulted Dr. Silberman for appearing to suggest that "good practice doesn't require clinicians to diagnose patients who present with atypical symptoms." According to the expert,

> "[m]any patients present with a constellation of symptoms, some of which may point directly to the diagnosis and some of which may be unrelated. The role of Emergency Medicine Clinician Specialists is to gather a complete history and, based on their clinical acumen and index of suspicion, create a list of the most dangerous and deadly pathologies that can explain the patient's symptoms and signs, and then move to rule in and rule out these diagnoses based on the results of diagnostic testing. Patients will present with typical and atypical histories, sometimes typical and textbook physical findings and sometimes not. It is up to the clinicians to examine them carefully and to be aware that not all conditions in all patients will show up with typical signs and symptoms."

The expert concluded that the decedent presented Melman with signs and symptoms that would and should have alerted an attentive emergency medicine clinician to the possibility that arterial dissection held an important place in the differential diagnosis, and that this condition "absolutely" had to be ruled in or out for the applicable standard of care to have been satisfied.

154308/2018  MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No.  001

Page 22 of 29

The plaintiffs' expert did not attribute malpractice to any specific acts or failures to act by Moore, Mazur, Altman, or Corujo-Vazquez. Nor did he address the issue of whether Melman properly supervised other LHGV personnel.

In reply, the Northwell defendants submitted an attorney's affirmation and a further affirmation from Dr. Silberman. Counsel first argued that summary judgment should be awarded to Moore, Mazur, Altman, or Corujo-Vazquez, and with respect to all of the Northwell defendants in connection both with any failure to supervise personnel and all attempts to resuscitate the decedent, since they established their prima facie entitlement to judgment as a matter of law and, by failing to address issues arising from such conduct, the plaintiffs failed to raise a triable issue of fact. She further argued that summary judgment also should be awarded to Northwell Health, Inc., and North Shore-LIH Health System, inasmuch as the Northwell defendants established that neither of these two entities provided any care or treatment to the decedent, and that the plaintiffs failed to raise a triable issue of fact since their submissions referred only to the care and treatment rendered by and at LHGV. Counsel also contended that the affirmation of the plaintiffs' expert was conclusory, specifically asserting that the affirmation was silent as to how Melman's and LHGV's alleged departures caused the decedent's death, and that, although the expert had essentially concluded that "if the condition was diagnosed, the decedent would have received timely treatment," the affirmation did not "in any way state what treatment could have been rendered to save her life." Dr. Silberman asserted in his reply affirmation, among other things, that the plaintiffs' expert based his or her conclusions on the

> "false assumption that the decedent complained of chest pain in the emergency room, when in fact, other than the triage note which records a chief complaint of chest discomfort and vertigo, and a history of the patient having been called in from urgent care for chest pain, there is not a single mention of chest pain."

The court concludes that, while the Northwell defendants established their prima facie entitlement to judgment as a matter of law in connection with the medical malpractice causes of action, and the wrongful death cause of action premised upon malpractice, the plaintiffs raised a

154308/2018  MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No.  001

Page 23 of 29

23 of 29

triable issue of fact, with their expert's affirmation, as to whether Melman departed from good and accepted medical practice in failing to take a proper and complete history of the decedent, failing to include aortic dissection high up in his differential diagnosis based on the decedent's complaints and test results, failing to order a CT angiogram of the decedent's chest and bedside cardiac ultrasound testing to rule aortic dissection in or out, and in failing to treat the decedent to retard the dissection before it became too late. They also raised a triable issue of fact as to whether those departures deprived the decedent of an opportunity for a cure or a better outcome, and whether those departures caused or contributed to her injuries and death.

The court rejects the Northwell defendants' contention that the plaintiffs' expert affirmation is deficient because he allegedly failed to opine what could have been done to save the decedent had aortic dissection been tested for and diagnosed in the late morning or early afternoon of October 22, 2016. In this respect, the Northwell defendants did not establish, prima facie, that every person suffering from an aortic dissection is doomed to die, or that if that condition is diagnosed in a patient, there is no treatment that could save that patient. In fact, they failed to adduce any facts with respect to the survival rate of patients who are diagnosed with aortic dissection while they were alive. Hence, the plaintiffs' expert was not required to opine on what measures had to be taken in connection with the decedent for her to have survived, although it is fairly common knowledge that some aortic dissection patients who have undergone emergent heart surgery have in fact survived. Moreover, the court also notes that, merely because a patient's complaint is not recorded in a medical chart, it does not automatically follow that such a complaint never had been made. "The logical fallacy here is so blatant as to hardly require explication: the absence of evidence is not the evidence of absence" (*Waters v Blaine*, 60 Misc 3d 1210[A], 2017 NY Slip Op 52008[U], *14, 2017 Misc LEXIS 5447, *42 [Sup Ct, Rensselaer County, 2017]; *see Miretsky v Macaulay,* 2023 NY Slip Op 31934[U], *29, 2023 NY Misc LEXIS 2845, *52-53 [Sup Ct, N.Y. County, Jun. 7, 2023] [Kelley, J.]). The fact that the decedent's complaints of serious chest pain "are not recorded in the

**154308/2018 MARIN, WALTER vs. NORTHWELL HEALTH, INC.** Page 24 of 29
Motion No. 001

24 of 29

contemporaneous medical records, although suggestive, is not dispositive" (*Shewbaran v Laufer*, 177 AD3d 510, 511 [1st Dept 2019]), since the records of both the urgent care facility and ambulance personnel reflected that the decedent indeed had made those complaints, as did the deposition testimony decedent's sister (*see id*.).

Hence, that branch of the Northwell defendants' motion seeking summary judgment dismissing so much of the medical malpractice cause of action insofar as asserted against Melman as was premised upon his alleged failure to consider, test for, and diagnose aortic dissection must be denied. Conversely, the Northwell defendants established, prima facie, that neither Moore, Mazur, Altman, nor Corujo-Vazquez committed any act of malpractice, that none of the Northwell defendants committed malpractice in failing to supervise personnel or in connection with attempts to resuscitate the decedent, and the plaintiffs failed to raise a triable issue of fact as to the alleged malpractice of Moore, Mazur, Altman, or Corujo-Vazquez, as to any alleged failure to supervise personnel and make proper attempts at resuscitation, or as to any legal responsibility of the defendants Northwell Health, Inc., and North Shore-LIH Health System, direct or otherwise, for the alleged malpractice committed by Melman. Hence, summary judgment must be awarded to the Northwell defendants dismissing the medical malpractice cause of action insofar as asserted against those particular defendants, as well so much of the medical malpractice cause of action against Melman as was premised upon his participation in the resuscitation efforts or alleged failure to supervise other personnel.

"'In general, under the doctrine of respondeat superior, a hospital may be held vicariously liable for the negligence or malpractice of its employees acting within the scope of employment'" (*Valerio v Liberty Behavioral Mgt. Corp*., 188 AD3d 948, 949 [2d Dept 2020], quoting *Seiden v Sonstein*, 127 AD3d 1158, 1160 [2d Dept 2015]; *see Hill v St. Clare's Hosp*., 67 NY2d 72, 79 [1986]; *Dupree v Westchester County Health Care Corp*., 164 AD3d 1211, 1213 [2d Dept 2018]). Hence, to the extent that this court has determined that triable issues of fact

exist as to Melman's malpractice, and there is no dispute that Melman was LHGV's employee, triable issues of fact also exist as to whether LHGV may be held vicariously liable.

"Conduct may be deemed malpractice, rather than negligence, when it 'constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician'" (*Scott v Uljanov*, 74 NY2d 673, 674, 675 [1989], quoting *Bleiler v Bodnar*, 65 NY2d 65, 72 [1985]). "When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence" (*Mendelson v Clarkstown Med. Assoc.*, 271 AD2d 584, 584, [2d Dept 2000]; *see Bleiler v Bodnar*, 65 NY2d at 72; *Morales v Carcione*, 48 AD3d 648, 649 [2d Dept 2008]; *Levinson v Health S. Manhattan*, 17 AD3d 247, 247 [1st Dept 2005]). Here, the Northwell defendants established that the plaintiffs alleged no facts giving rise to an independent claim sounding in common-law negligence, and that all their claims of breach of duty sound only in medical malpractice. The plaintiffs failed to raise a triable issue of fact in opposition to that showing. Hence, that branch of the motion, in effect, seeking summary judgment dismissing the common-law negligence cause of action as duplicative of the medical malpractice cause of action must be granted (*see Cebularz v Samadi*, 2019 NY Slip Op 31260[U], *5, 2019 NY Misc LEXIS 2242, *5 [Sup Ct, Kings County, Apr. 24, 2019]).

The elements of a cause of action to recover for lack of informed consent are:

> "(1) that the person providing the professional treatment failed to disclose alternatives thereto and failed to inform the patient of reasonably foreseeable risks associated with the treatment, and the alternatives, that a reasonable medical practitioner would have disclosed in the same circumstances, (2) that a reasonably prudent patient in the same position would not have undergone the treatment if he or she had been fully informed, and (3) that the lack of informed consent is a proximate cause of the injury"

(*Spano v Bertocci*, 299 AD2d 335, 337-338 [2d Dept 2002]; *see Zapata v Buitriago*, 107 AD3d 977, 979 [2d Dept 2013]; *Balzola v Giese*, 107 AD3d 587, 588 [1st Dept 2013]; *Shkolnik v Hospital for Joint Diseases Orthopaedic Inst.*, 211 AD2d 347, 350 [1st Dept 1995]). For a statutory claim of lack of informed consent to be actionable, a defendant must have engaged in

154308/2018 MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No. 001

Page 26 of 29

26 of 29

a "non-emergency treatment, procedure or surgery" or "a diagnostic procedure which involved invasion or disruption of the integrity of the body" (Public Health Law § 2805-d[2]). "'[T]his showing of qualitative insufficiency of the consent [is] required to be supported by expert medical testimony'" (*King v Jordan*, 265 AD2d at 260, quoting *Hylick v Halweil*, 112 AD2d 400, 401 [2d Dept 1985]; *see* CPLR 4401-a; *Gardner v Wider*, 32 AD3d 728, 730 [1st Dept 2006]). Hence, where a defendant establishes his or her prima facie entitlement to judgment as a matter of law in connection with a lack of informed consent cause of action by submitting an expert affirmation from a physician, a plaintiff can only raise a triable issue of fact by submitting "an expert affirmation stating with certainty that the information defendant[ ] allegedly provided to plaintiff before the [medical] procedures at issue departed from what a reasonable practitioner would have disclosed" (*Leighton v Lowenberg*, 103 AD3d 530, 530 [1st Dept 2013]).

"A failure to diagnose cannot be the basis of a cause of action for lack of informed consent unless associated with a diagnostic procedure that 'involve[s] invasion or disruption of the integrity of the body'" (*Janeczko v Russell*, 46 AD3d 324, 325 [1st Dept 2007], quoting Public Health Law § 2805-d[2][b]; *see Lewis v Rutkovsky*, 153 AD3d at 456). In addition to invasive diagnostic testing arising from a failure properly to diagnose a medical condition, the administration of nonindicated medications arising from a misdiagnosis may also be the basis for a lack of informed consent cause of action (*see Lyons v Vassar Bros. Hosp.*, 30 AD3d 477, 478 [2d Dept 2006]).

Dr. Silberman asserted that the only procedures that the defendants performed that theoretically could have supported a cause of action to recover for lack of informed consent were the endotracheal intubation that Melman performed, and the pericardiocentesis that performed Altman performed with Corujo-Vazquez's assistance, and that both of those procedures were performed emergently, under life-threatening circumstances, when the decedent was unconscious. As he phrased it, consent "is clearly not possible under these circumstances and is not the standard of care," and he asserted that there is no evidence

**154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.**
**Motion No.  001**

**Page 27 of 29**

[* 27]

27 of 29

that any lack of consent herein caused harm to the decedent.

In opposition to the Northwell defendants' showing in this respect, the plaintiffs' expert did not address the lack of informed consent claim. The court agrees with Dr. Silberman that the invasive treatment rendered to the decedent subsequent to her syncope did not require consent, since it constituted an emergency (*see* Public Health Law § 2805-d[4][c]; *Kayser v Sattar*, 57 AD3d 1245, 1246 [3d Dept 2008]; *Connelly v Warner*, 248 AD2d 941, 942 [4th Dept 1998]; *Dennehy v Harlem Hosp. Ctr.,* 2020 NY Slip Op 35439[U], *9, 2020 NY Misc LEXIS 23486, *21 [Sup Ct. N.Y. County, Jul. 28, 2020]; *Medina v Hassen*, 2010 NY Slip Op 30522[U], *10-11, 2010 NY Misc LEXIS 2581, *14 [Sup Ct, N.Y. County, Mar. 11, 2010]), and that the allegations that the Northwell defendants failed timely and properly to perform certain testing and diagnose the decedent with incipient aortic dissection cannot support a lack of informed consent cause of action. Hence, that branch of the Northwell defendants' motion seeking summary judgment dismissing the lack of informed consent cause of action must be granted.

The Northwell defendants' remaining contentions are without merit.

Accordingly, it is,

ORDERED that the motion is granted only to the extent that,

> (a) the movants are awarded summary judgment dismissing the complaint insofar as asserted against Northwell Health, Inc., North Shore-LIJ Health System, Nicholas D. Altman, Omar Corujo-Vazquez, John F. Moore, and Shawn P. Mazur;

> (b) the movants are awarded summary judgment dismissing the lack of informed consent and common-law negligence causes of action insofar as asserted against Lenox Health Greenwich Village and Saul D. Melman;

> (c) the movants are awarded summary dismissing so much of the medical malpractice and wrongful death causes of action, insofar as asserted against Lenox Health Greenwich Village and Saul D. Melman, as was premised upon departures from good and accepted practice in the course of attempting to resuscitate the plaintiffs' decedent after she had lost consciousness and for failure to supervise other hospital personnel,

the complaint is dismissed insofar as asserted against Northwell Health, Inc., North Shore-LIJ Health System, Nicholas D. Altman, Omar Corujo-Vazquez, John F. Moore, and Shawn P.

154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.
Motion No.  001

Page 28 of 29

Mazur, the causes of action to recover for lack of informed consent and common-law negligence are dismissed insofar as asserted against Lenox Health Greenwich Village and Saul D. Melman, and so much of the medical malpractice and wrongful death causes of action as was premised upon departures from good and accepted practice in the course of attempting to resuscitate the plaintiffs' decedent after she had lost consciousness and for failure to supervise other hospital personnel is dismissed insofar as asserted against Lenox Health Greenwich Village and Saul D. Melman, and the motion is otherwise denied; and it is further,

ORDERED that, on the court's own motion, the action is severed against Northwell Health, Inc., North Shore-LIJ Health System, Nicholas D. Altman, Omar Corujo-Vazquez, John F. Moore, and Shawn P. Mazur; and it is further,

ORDERED that the Clerk of the court shall enter judgment dismissing the complaint insofar as asserted against Northwell Health, Inc., North Shore-LIJ Health System, Nicholas D. Altman, Omar Corujo-Vazquez, John F. Moore, and Shawn P. Mazur; and it is further,

ORDERED that that, on the court's own motion, the attorneys for all of the remaining parties shall appear for an initial pretrial settlement conference before the court, in Room 204 at 71 Thomas Street, New York, New York 10013, on March 26, 2025, at 9:30 a.m., at which time they shall be prepared to discuss resolution of the action and the scheduling of a firm date for the commencement of jury selection.

This constitutes the Decision and Order of the court.

| 3/4/2025 | | |
|---|---|---|
| **DATE** | | **JOHN J. KELLEY, J.S.C.** |

| CHECK ONE: | | CASE DISPOSED | | **X** | NON-FINAL DISPOSITION | | |
|---|---|---|---|---|---|---|---|
| | | GRANTED | | DENIED | **X** | GRANTED IN PART | | OTHER |
| APPLICATION: | | SETTLE ORDER | | | SUBMIT ORDER | | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | | REFERENCE |

**154308/2018   MARIN, WALTER vs. NORTHWELL HEALTH, INC.**
**Motion No.  001**

**Page 29 of 29**

29 of 29

[* 29]